```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
                              EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
-vs-                               )
                                   )
ABRAHAM BROWN, KENNETH TAYLOR,     )   Case No. 12 CR 632
ALFRED WASHINGTON, DWAINE          )
JONES and CHRISTOPHER DAVIS,       )   Chicago, Illinois
                                   )   March 12, 2018
              Defendants.          )   10:33 a.m.
-------------------------------    )
UNITED STATES OF AMERICA,          )
              Plaintiff,           )   Case No. 12 CR 887
-vs-                               )
                                   )
ANTONIO WILLIAMS and JOHN T.       )
HUMMONS,                           )
              Defendants.          )
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHIEF JUDGE RUBEN CASTILLO
APPEARANCES:

For the Government:       HON. JOHN R. LAUSCH, JR.
                          UNITED STATES ATTORNEY
                          BY:  MS. ANDRIANNA D. KASTANEK
                               MR. MATTHEW L. KUTCHER
                               MR. PHILIP FLUHR
                          219 S. Dearborn Street
                          Chicago, IL  60604
                          (312) 353-5300
                          E-mail:  Andrianna.Kastanek@usdoj.gov
                                   Matthew.Kutcher@usdoj.gov
                                   Philip.fluhr@usdoj.gov

Court Reporter:

            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                     Official Court Reporter
                    United States District Court
            219 South Dearborn Street, Suite 2524-A
                       Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
               Kathleen_Fennell@ilnd.uscourts.gov

Case: 1:12-cr-00632 Document #: 701 Filed: 04/12/18 Page 2 of 19 PageID #:6965

2

```
 1   APPEARANCES:   (Continued)

 2   For Defendants Washington
     And Hummons:              MR. STEVEN SHOBAT
 3                             53 West Jackson Boulevard
                               Suite 1464
 4                             Chicago, IL  60604
                               (312) 353-2118
 5                             Steven.shobat@sbcglobal.net

 6                             MR. STEVEN SALTZMAN
                               200 South Michigan Avenue
 7                             Suite 201
                               Chicago, IL  60604
 8                             (312) 427-4500
                               E-mail:  Saltzcases@gmail.com
 9
                               MS. ALISON MARLOWE SIEGLER
10                             MS. ERICA K. ZUNKEL
                               Mandell Legal Aid Clinic
11                             University of Chicago Law School
                               6020 S. University Avenue
12                             Chicago, IL  60637
                               (773) 834-1680
13                             E-mail:  Alisonsiegler@uchicago.edu
                                        Ezunkel@uchicago.edu
14
     For Defendant Brown:      MS. CANDACE R. JACKSON
15                             MR. DANIEL HESLER
                               Federal Defender Program
16                             55 East Monroe Street
                               Suite 2800
17                             Chicago, IL  60603
                               (312) 621-8343
18                             E-mail:  Candace_jackson@fd.org
                                        Daniel_Hesler@fd.org
19
     For Defendant Taylor:     MR. MICHAEL JAMES FALCONER
20                             35 East Wacker
                               Suite 650
21                             Chicago, IL  60601
                               (312) 236-7177
22                             E-mail:  Mfalconer@prodigy.net

23   For Defendant Davis:      MR. GERARDO S. GUTIERREZ
                               53 West Jackson Boulevard
24                             Suite 1651
                               Chicago, IL  60604
25                             (312) 786-9970
                               E-mail:  G8370172@sbcglobal.net
```

```
 1  APPEARANCES: (Continued)

 2  For Defendant
    Williams:              MS. CANDACE R. JACKSON
 3                         Federal Defender Program
                           55 East Monroe Street
 4                         Suite 2800
                           Chicago, IL  60603
 5                         (312) 621-8343
                           E-mail:  Candace_jackson@fd.org
 6
    For Defendant Jones:   MR. GERALD J. COLLINS
 7                         53 West Jackson Boulevard
                           Suite 1638
 8                         Chicago, IL  60604
                           (312) 641-1950
 9                         E-mail:  Gjc1310@aol.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

    (Proceedings heard in open court:)
    THE CLERK: 12 CR 632, United States versus Abraham Brown, Kenneth Taylor, Alfred Washington, Duane Jones and Christopher Davis, and 12 CR 887, United States versus Antonio Williams, John Hummons and Howard Lee.
    MS. KASTANEK: Good morning.
    THE COURT: Good morning.
    MS. KASTANEK: Good morning, your Honor. Andrianna Kastanek, Matt Kutcher and Phil Fluhr on behalf of the United States.
    MS. SIEGLER: Good morning, your Honor. Alison Siegler and Erica Zunkel appearing on behalf of both Mr. Hummons and Mr. Washington.
    MR. SHOBAT: Good morning, your Honor. Steven Shobat on behalf of Alfred Washington who's present in court, Judge.
    MR. SALTZMAN: Good morning, Judge. Steven Saltzman on behalf of John Hummons.
    MS. JACKSON: Good morning, your Honor. Candace Jackson, Federal Defender Program, along with Dan Hesler for Abraham Brown and then appearing myself for Antonio Williams.
    MR. FALCONER: Good morning, Judge.
    THE COURT: Good morning.
    MR. FALCONER: Michael Falconer for Kenneth Taylor.
    MR. COLLINS: Good morning, your Honor. Gerald Collins on behalf of Dwaine Jones.

|            |    |                                                                  |
|------------|----|------------------------------------------------------------------|
|            | 1  | THE COURT: Okay. This matter is set for a ruling.                |
|            | 2  | Before I rule, is there anything you want to say?                |
|            | 3  | MS. SIEGLER: No, your Honor.                                     |
|            | 4  | THE COURT: Okay. Then I'm going to ask everybody to              |
| 10:34:32   | 5  | be seated, and I do want to explain the procedures for issuing   |
|            | 6  | this ruling because I know there is some public interest in      |
|            | 7  | this ruling. So in a few minutes, I'm going to lock or ask       |
|            | 8  | the marshals to lock that courthouse door.                       |
|            | 9  | So if anybody wants to leave, they're free to do so              |
| 10:35:03   | 10 | in the next couple of minutes. Other than that, you're going     |
|            | 11 | to be captive for a few minutes, and the reason I'm doing that   |
|            | 12 | is I don't want anybody to be rushing out of here to try and     |
|            | 13 | break any type of story. I can assure you that we will have      |
|            | 14 | copies of this ruling for everyone.                              |
| 10:35:23   | 15 | So with that understanding, if anybody wants to                  |
|            | 16 | leave, now is the time to leave.                                 |
|            | 17 | Okay. It is time to rule in this case. I've                      |
|            | 18 | presided over this case for quite some time. By my               |
|            | 19 | calculation, it's been about six years, and I want to explain    |
| 10:35:44   | 20 | a couple of things for the general public.                       |
|            | 21 | This case, these two cases, were randomly assigned to            |
|            | 22 | me as a District Court Judge. It just happens that since the     |
|            | 23 | time these cases were randomly assigned to me, I have assumed    |
|            | 24 | the position of Chief Judge, but being Chief Judge has nothing   |
| 10:36:06   | 25 | to do with presiding over these cases.                           |

10:36:31

1  Each of these cases that are pending before me and my
2  colleagues are the product of a random assignment system, and
3  each of these cases might result in different rulings.  My
4  effort is merely to try and move the ball along in these
5  delayed cases.  It just happens that I believe I will be the
6  first judge to rule on what is pending before me.  It's not
7  being done because I'm the Chief Judge and other judges are
8  waiting for me.  I think it has more to do with the fact that
9  I'm fortunate enough not to be assigned new criminal cases
10 since the time that I became Chief Judge almost five years
11 ago, in 2013.
12  What that means is why are these two cases pending so
13 long?  I will talk about that in an instant.
14  It is these two cases, and it happens together with
15 another criminal case involving the alleged drug conspiracy
16 involving a pretty famous defendant, Chapo Guzman, that are my
17 remaining criminal cases.
18  Having said that, I think it's important for the
19 members of the public to understand that each judge brings
20 their life experience to bear in each case, and when it comes
21 to criminal justice experience, my life experience goes back
22 to 1974.  By my calculation, although I hate to admit this
23 every day I look in the mirror, that is some 44 years ago.
24  So 44 years ago, I walked into a courtroom at 26th
25 and California as a college sophomore and started serving in

1 the state court system as a deputy clerk.  In that capacity, I
2 served through my completion of my undergraduate studies in
3 this city at Loyola University, which is having its moment of
4 fame this week, and then continued to work full-time at 26th
5 and California and at 11th and State while I completed my
6 education at Northwestern Law School.
7       At Northwestern Law School, again, criminal law
8 seemed to follow me when I served on the Journal of Criminal
9 Law and Criminology.
10       I then joined the law firm of Jenner & Block, where
11 the first case that I ever tried was as a defense attorney,
12 defending a young African American male on murder charges at
13 26th and California.  I'm happy to say that even though we
14 lost that trial, we prevailed at the appellate level.  And
15 from there, after doing a number of criminal cases as a
16 defense attorney, I joined the U.S. Attorney's Office, where I
17 served from 1984 to 1988.
18       Probably what people unfortunately most remember me
19 for is for asserting myself in the war on drugs, and in that
20 capacity, I sent many minority defendants to jail, including
21 one minority defendant who happened to be of Colombian
22 background who actually put a murder contract on me.  And I
23 can tell you that I survived that ordeal because of undercover
24 agents who were serving as fake hit men who were going to put
25 the hit on me.

1       So I've had a lot of different experiences.

2       In 1994, I was appointed to this court by President
3  Clinton.  In 1999, President Clinton again sought to use my
4  criminal justice experience and appointed me the vice chair of
5  the United States Sentencing Commission.  The rest you can
6  look up.

7       I'm now going to read the first few pages of my
8  opinion.  I normally don't do this, but I will do it in this
9  case because I think these cases are extraordinary.

10       "Since 2006, the Bureau of Alcohol, Tobacco, Firearms
11 & Explosives, the ATF, has engaged in sting operations wherein
12 undercover agents present individuals in this District with an
13 opportunity to rob a fictitious drug stash house."  See
14 generally *United States v. Mayfield*, *United States v. Lewis*.
15 Both of those are Seventh Circuit cases.

16       "These two long-pending consolidated criminal cases,
17 which are part of what is commonly referred to as the 'false
18 stash house cases,' have served to undermine legitimate law
19 enforcement efforts in this country.  It is undisputed that
20 between 2006 and 2013, the defendants charged in this District
21 in the ATF false stash house cases were 78.7 black,
22 9.6 percent Hispanic, and 11.7 percent white.  During this
23 same period, the District's adult population was approximately
24 18 percent black, 11 percent Hispanic, and 63 percent white.
25 These numbers generate great disrespect for law enforcement

efforts. Disrespect for the law simply cannot be tolerated during these difficult times. It is time for these false stash house cases to end and be relegated to the dark corridors of our past. To put it simply, our criminal justice system should not tolerate false stash house cases in 2018.

"No one feels stronger than this Court about the problems this District has continuously had with firearm violence. During this Court's three decades of public service, it has consistently pointed out and stressed the deadly toll firearms have taken in Chicago and throughout the country. In fact, during this Court's 11 years of service on the United States Sentencing Commission, it strongly advocated for and accomplished the strengthening of penalties for firearm trafficking.

"This Court understands that dedicated federal agents who often place themselves in life-risking situations sincerely believed that they would recover deadly firearms from the violent streets of our District in these stash house sting operations. However, to paraphrase Supreme Court Justice Louis Brandeis, to declare that in the administration of criminal law 'the end justifies the means' is to declare that the government may violate fundamental principles of common fairness to secure the conviction of an alleged criminal. This is not where our criminal law should be in 2018. Our society simply cannot accept a 'win at all costs'

1 mentality in the delicate world of criminal law enforcement,
2 which is ultimately dependent on proactive citizen
3 involvement.
4 "Our nation's current tragic pattern of weapons
5 violence does not justify the problematic consequences
6 presented by the government's use of false stash house cases
7 as an investigative technique. The answer to our nation's
8 current tragic pattern of weapons violence lies in stricter
9 firearms regulations, especially with respect to automatic,
10 multi-round weapons and traditional law enforcement
11 investigative techniques. This Court is mindful that the city
12 just passed the 89th anniversary of the infamous St.
13 Valentine's Day massacre, which killed seven Chicagoans with
14 automatic weapon fire, yet even during the low points of the
15 great violence caused by the alcohol wars of Prohibition, the
16 ATF did not seek to use 'false alcohol warehouse' tactics
17 against any ethnic organized crime groups to promote public
18 safety. Instead, the ATF used solid investigative work to
19 garner the great public respect of the Elliot Ness era that
20 still lives today as the gold standard of law enforcement.
21 This type of work inspires great public cooperation with law
22 enforcement, unlike the false drug stash houses cases before
23 the Court.
24 "The problems with false stash house cases start at
25 the beginning and do not get any better at the end. The

typical false stash house case commences with the recruitment of a confidential informant, or CI.  Most of the time, these are individuals with criminal justice problems.  In today's world, they tend to be black or Hispanic, two groups that unfortunately dominate both our federal and local American criminal justice systems.  These principally minority confidential informants are told by federal agents to tell their friends and associates that there are places with a large quantity of drugs that can be robbed.  The hope is that the informants will organize robbery groups that will result in significant arrests of violent criminals and seizure of weapons.  Sometimes these cases work out in that fashion.  However, all too often, the government's lucrative trap attracts potential defendants with minor criminal records who might otherwise have never attempted a fictitious crime of this nature.  It is no surprise that many of these potential defendants with minor criminal records are also minorities, like their so-called confidential informant friends and associates.  At the end, many of the defendants face Sentencing Guideline ranges that have been significantly inflated by the government's false drug house scenarios.  See *United States v. Washington*, Third Circuit case, remanding for potential post-judgment discovery to challenge a 264-month sentence in a fictitious cocaine robbery scenario that triggered a very real 20-year mandatory minimum sentence.  The

*Washington* case in particular is representative of a broad point of view held by judges who are held in high esteem by this Court. For example, Judge Theodore McKee, the former Chief Judge of the U.S. Court of Appeals for the Third Circuit, has pointedly noted that 'the potential for abuse and mischief that is endemic to fictitious stash house stings should not be ignored.' Judge McKee specifically noted that 'as is all too often the case, not only do stash house stings risk ensnaring those who might otherwise not have committed crimes, but also the resulting convictions regularly give rise to particularly dubious applications of the Sentencing Guidelines and mandatory minimum sentences.'

"The inherent problems of this District's false stash house cases must be seen through the lens of our country's sad history of racism. Every time our country's law enforcement system can be perceived as contributing to that sad history, our justice system suffers and needlessly alienates minority communities who no longer wish to come forward as witnesses or victims. This Court spent more than ten years working as a member of the United States Sentencing Commission before it could reduce the needless disparity between the penalties for crack and powder cocaine, which were correctly revised because they were perceived as discriminatory toward black defendants. This country cannot afford such self-inflicted wounds in light of its sad history of racism. Viewed in this context, the

false stash house cases are no different than the extraordinary powder/crack sentencing disparities that previously existed.

"In these two cases, defendants moved to dismiss the indictments filed against them on grounds of racial profiling, arguing that ATF wrongly targeted black and Hispanic individuals for participation in the stings. These cases are deeply troubling and emblematic of problems that have plagued our criminal justice system for decades. As this Court recognized nearly two decades ago, racial profiling -- 'Racial profiling of any kind is anathema to our criminal justice system because it eviscerates the core integrity that is necessary to operate that system effectively in our diverse democracy.'" Quoting from the case that I had of *Martinez v. Village of Mt. Prospect*. "These words carry as much force today as they did nearly two decades ago. These sting operations have used tremendous public resources to investigate and prosecute a large number of principally minority individuals for fictitious crimes. 'In this era of mass incarceration in which we already lock up more of our population than any other nation on earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them.' There I'm quoting from *United States v. Black*, a Ninth Circuit case decided in 2014.

"Over and over again, these 'tawdry' stings have been 'directed at unsophisticated, and perhaps desperate defendants ... who easily take the all-too-tempting bait put out for them by the government.'" Quoting from *United States v. Conley*, Seventh Circuit, 2017.

"Like our colleague in the United States Court of Appeals for the Sixth Circuit, this Court finds 'the concept of these'" sting house -- "'these stash house sting operations at odds with the pride we take in presenting American criminal justice'" system -- "'American criminal justice as a system that treats defendants fairly and equally under the law.'" Quoting from *United States v. Flowers*. "It is unclear to the Court why, with all the tactics available to them, federal law enforcement agents would adopt a narrative tinged with racial overtones to conduct sting operations involving serious federal crime charges. Even if law enforcement agents stay on the right side of the line, this is dangerous territory. It hardly needs to be stated that agents of the federal government should not be injecting the issue of race into their criminal investigation in any way, shape, or form.

"Fortunately for the government, the question before this Court is not whether the practices used in these sting operations are honorable or fair. Instead, the sole question presented to the Court in these cases is whether law enforcement agents violated the Due Process Clause of the

1 Fifth Amendment in pursuing these investigations.  At first
2 blush, the evidence submitted by defendants, including the
3 sheer number of nonwhite individuals prosecuted as a result of
4 the sting operations, presents troublesome indicia of
5 discrimination.  But this Court is not permitted to simply
6 accept matters at first blush.  The Court must dig deeper to
7 test the reliability and weight of the evidence that has been
8 submitted.  In so doing, the Court concludes that the
9 defendants have failed to meet the heavy burden that currently
10 must be satisfied to obtain dismissal of a federal criminal
11 indictment.  Therefore, the motions to dismiss must be
12 reluctantly denied."
13      And with that, I'm going to pause, and I'm going to
14 ask my staff to pass out copies of this 73-page opinion.
15   (Pause.)
16      THE COURT:  And we will make copies available to
17 everybody else in the courtroom as soon as I'm done, which is
18 going to be about ten minutes or less.
19      I'm not going to read the rest of the opinion.  I
20 appreciate the indulgence of reading the first five-and-a-half
21 pages.
22      What I am going to do is try and explain what follows
23 in the opinion.  Pages 6 all the way through Page 15 just
24 lay out the facts of the case as the Court found them.
25      Page 15 all the way through 18 explains how I

1 presided over the discovery proceedings that occurred in this
2 case.
3     And I will pause there and say it is my calculation
4 that this Court has given more discovery to the defense on
5 this issue than any other court has ever given the defense,
6 not only in this District but, by my calculation, in the
7 United States.
8     Page 19 in particular, I would point out to those lay
9 people in the audience lays out the difficult standard that
10 must be met to obtain dismissal of an indictment. Dismissal
11 of an indictment is a very difficult thing to accomplish. In
12 my almost 24 years on the bench, I've only had one indictment
13 that I have ever dismissed. I'm not fearful of dismissing an
14 indictment, but it is my determination that the standards just
15 have not been met, and as I point out on Page 19, "A claim of
16 selective prosecution is governed by ordinary equal protection
17 standards. To establish an equal protection violation in this
18 context, the defendant must demonstrate that the
19 administration of the criminal law was directed so exclusively
20 against a particular class of persons ... with a mind so
21 unequal and oppressive that the system of prosecution amounts
22 to a practical denial of equal protection of the law." The
23 defendant must come forward with clear evidence showing that
24 the decision to prosecute had two things: 1, a discriminatory
25 effect, and, No. 2, that it was motivated by a discriminatory

1 purpose.

2 Now, I know that the defendants disagree with the
3 standard that I am using. I point out at Page 21 of the
4 opinion that the defense asked me to apply a lesser standard
5 than clear and convincing evidence, of one of a preponderance
6 of the evidence. It is my conclusion under my analysis of the
7 law as a District Court Judge who gets no special privileges
8 for being Chief Judge, that that is not the right standard,
9 that the clear right standard at this point in time, given the
10 state of the law, is one that requires a clear, harder
11 standard of proof than one of mere preponderance of the
12 evidence. And in that sense, the opinion speaks for itself.

13 The next thing I'm going to point out in the opinion
14 is there is coverage of the testimony of the two experts that
15 testified before our panel of judges. I do want to commend
16 both experts. I also want to commend the attorneys in this
17 case. The lawyering in this case has been nothing but first
18 rate. The experts in this case have been first rate. And
19 essentially, aside from some of the problems I outlined with
20 Dr. Fagan's testimony, it almost basically is a tie in terms
21 of the expert evidence presented here, but in this case,
22 because the defense has the burden of proof, and a hard burden
23 of proof, that is why Dr. Fagan's testimony as it is with the
24 problems that it has doesn't accomplish the dismissal of both
25 indictments that the defendants are seeking.

|  |  |
|---|---|
| 11:00:26 | 1  The other thing that I want to explain is the
2  defendants' request for further discovery, and I address that
3  in the last part of the opinion. And the Court will simply
4  reiterate again, I've given the defense the benefit of many
5  discovery rulings. |
| 11:00:48 | 6  A lot of these discovery rulings were with the
7  government kicking and screaming. A lot of these discovery
8  rulings were with the Illinois State Police coming in here and
9  protesting. I think I have carefully followed the Seventh
10 Circuit's *Davis* opinion, the Third Circuit's opinion in |
| 11:01:13 | 11 *Washington*, and no further discovery is necessary. In fact,
12 the defense two sessions ago conceded that they were ready for
13 the Court's ruling without further discovery. But I'm not
14 relying on that. I believe I got the discovery issues right
15 in this case. Maybe some other court will disagree. |
| 11:01:39 | 16 So the last part that I'm going to read and then we
17 will conclude these proceedings is the conclusion on Page 73.
18 "These delayed criminal cases must come to a
19 conclusion soon. Defendants' attorneys raise serious,
20 difficult issues that relate to the continuous historic |
| 11:02:00 | 21 tension our country's criminal law enforcement procedures have
22 had with our country's racially diverse community. The future
23 of these cases is squarely within the discretion of our new
24 U.S. Attorney. This Court can only point out its concerns in
25 this opinion and proceed to set priority trial dates in these |

<br>

          1    The other thing that I want to explain is the
          2   defendants' request for further discovery, and I address that
          3   in the last part of the opinion.  And the Court will simply
          4   reiterate again, I've given the defense the benefit of many
11:00:26  5   discovery rulings.
          6          A lot of these discovery rulings were with the
          7   government kicking and screaming.  A lot of these discovery
          8   rulings were with the Illinois State Police coming in here and
          9   protesting.  I think I have carefully followed the Seventh
11:00:48  10  Circuit's *Davis* opinion, the Third Circuit's opinion in
          11  *Washington*, and no further discovery is necessary.  In fact,
          12  the defense two sessions ago conceded that they were ready for
          13  the Court's ruling without further discovery.  But I'm not
          14  relying on that.  I believe I got the discovery issues right
11:01:13  15  in this case.  Maybe some other court will disagree.
          16         So the last part that I'm going to read and then we
          17  will conclude these proceedings is the conclusion on Page 73.
          18         "These delayed criminal cases must come to a
          19  conclusion soon.  Defendants' attorneys raise serious,
11:01:39  20  difficult issues that relate to the continuous historic
          21  tension our country's criminal law enforcement procedures have
          22  had with our country's racially diverse community.  The future
          23  of these cases is squarely within the discretion of our new
          24  U.S. Attorney.  This Court can only point out its concerns in
11:02:00  25  this opinion and proceed to set priority trial dates in these

1 two long delayed cases."

2 Both cases will be set for status hearings on
3 March 21st, 2018 at 10:30 in the morning for the express
4 purpose of setting both cases for jury trials in the near
5 future, and both cases will get expedited jury trial dates
6 from this Court, so bring your calendar books. That's all I
7 can ask.

8 This Court will exclude time from today's date until
9 March 21st, 2018, when I fully intend to set both cases for
10 trial.

11 Now we will unlock the courthouse doors. I would ask
12 the media that if you want some comment from the attorneys,
13 which this Court has no problems from, I think fairness
14 dictates that you give them some time to digest this Court's
15 73-page opinion, and then perhaps they will see you as they
16 will on their own arrange in the appropriate media area that
17 our court provides in the lobby of this federal courthouse.

18 This Court stands in recess. Thank you.
19 (Which were all the proceedings heard.)

20 CERTIFICATE

21 I certify that the foregoing is a correct transcript from
22 the record of proceedings in the above-entitled matter.

23 */s/Kathleen M. Fennell*      April 12, 2018

24 _____      _____
Kathleen M. Fennell            Date
25 Official Court Reporter